Frank D. FELIX, d/b/a J. C.'s Rock Saloon, Back Seat Saloon Country Cousin, Inc., a Michigan Corporation, Theresa Haver, Carol Prantera, Kathy Bugaj, Guardian Pharmacy, Inc., a Michigan Corporation, Robert Sternberg, Jeffrey Scott Sternberg, and Jane Marie Smith, Plaintiffs,

v.

The Honorable William G. MILLIKEN, in his capacity as Governor of the State of Michigan, Frank J. Kelley, in his official capacity as Attorney General of the State of Michigan, Stanley Thayer, in his official capacity as Chairman of the Michigan Liquor Control Commission, and Louis Jarboe, Thomas A. Van Tiem, Sr., Edward Weist and Joseph Wisniewski, in their official capacities as duly appointed members of the Michigan Liquor Control Commission, Defendants.

James T. FARRELL, Peggy L. O'Dell, David Fischer, Mark Armitage, Linda Feldt, Janice H. Danigin, Jeffrey A. Lebow, Dooley's Inc., a Michigan Corporation, Ann "R" Inc., a Michigan Corporation d/b/a Second Chance, Alibi, Inc., a Michigan Corporation, Roy Lancaster and Diane Lancaster, d/b/a Woodworth House, Vince Catapano, d/b/a Pompei Lounge, and Michigan Committee for the Age of Responsibility, Plaintiffs,

v.

Stanley G. THAYER, Louis G. Jarboe, Thomas A. Van Tiem, Sr., Edward F. Weist and Joseph L. Wisniewski, members of the Michigan Liquor Control Commission, and Frank J. Kelley, Attorney General of the State of Michigan, Defendants.

Civ. Nos. 78–73015, 78–73159.

United States District Court, E. D. Michigan, S. D.

Dec. 22, 1978.

Stephen M. Taylor and Carl L. Rubin, Southfield, Mich., Robert Eugene Smith, Atlanta, Ga., Avern L. Cohn and Stephen F. Wasinger, Detroit, Mich., for plaintiffs.

George H. Weller and Deborah Anne Devine, Asst. Attys. Gen., Lansing, Mich., for defendants.

## OPINION

GUY, District Judge.

The court has before it two consolidated cases both challenging the constitutionality of a constitutional amendment passed by the voters of the State of Michigan on November 7, 1978. *Felix* was filed in this court on November 20, 1978. *Farrell* was filed in the Circuit Court for the County of Wayne on November 27, 1978, and was removed to this court by the defendants on December 8, 1978. Both cases sought temporary injunctive relief and on December 18, 1978, a hearing was commenced. Pursuant to Rule 65 and by agreement of the parties, the trial of this matter was advanced so that there could be a complete disposition prior to the December 23, 1978 effective date of the constitutional amendment.

The amendment was to Article IV, Section 40, of the Michigan Constitution of 1963, which now reads, as amended (new language in capital letters):

A PERSON SHALL NOT SELL OR GIVE ANY ALCOHOLIC BEVERAGE TO ANY PERSON WHO HAS NOT REACHED THE AGE OF 21 YEARS. A PERSON WHO HAS NOT REACHED THE AGE OF 21 YEARS SHALL NOT POSSESS ANY ALCOHOLIC BEVERAGE FOR THE PURPOSE OF PERSONAL CONSUMPTION. AN ALCOHOLIC BEVERAGE IS ANY BEVERAGE CONTAINING ONE–HALF OF ONE PERCENT OR MORE ALCOHOL BY VOLUME. EXCEPT AS PROHIBITED BY THIS SECTION, [t]he legislature may by law establish a liquor control commission which, subject to statutory limitations, shall exercise complete control of the alcoholic beverage traffic within this state, including the retain sales thereof. The legislature may provide for an excise tax on such sales. Neither the legislature nor the commission may authorize the manufacture or sale of alcoholic beverages in any county in which a majority of the electors voting thereon shall prohibit the same.

This amendment was proposed by the electorate pursuant to the provisions of Article 12, Section 2, of the Michigan Constitution, which reads in pertinent part as follows:

Sec. 2. Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. . . .

Over the last several decades, there have been several changes in the minimum legal drinking age within the State of Michigan. In 1933, the legislature established the minimum age for the consumption of alcoholic beverages at 21 except for beer for which the age was established at 18. In 1937, the minimum age for all alcoholic beverages, including beer, was raised to 21. No further changes occurred until Congress proposed the twenty-sixth amendment which was ratified by the requisite number of states and certified on July 5, 1971. The effect of the twenty-sixth amendment was to lower the voting age in all elections to 18. On the heels of the adoption of the twenty-sixth amendment, several states, including Michigan, reviewed their age of majority and minimum drinking age laws. In August of 1971, the Michigan Legislature adopted Public Act No. 79 which lowered the age of majority in Michigan to 18. As of January 1, 1972, the legal minimum drinking age in Michigan for all types of alcoholic beverages became 18 years of age.

At or about this same period of time, 27 other states reduced their minimum drinking age although there was no unanimity as to the minimum drinking age established—there being a range between 18 and 20 years of age.

Some five years after this flurry of reductions in the minimum drinking age, it appears that several states have reviewed their earlier decision in this regard. In 1976, Minnesota raised its minimum drinking age. In 1977, Maine raised its minimum drinking age. And the Michigan Legislature in 1978, through the enactment of Public Act 94, raised the minimum drinking age from 18 to 19, said new minimum to be effective December 3, 1978. Thus, as of this moment, the minimum drinking age in the State of Michigan is 19 years of age. It should be noted that the plaintiffs in this litigation do not challenge the Michigan legislative enactment raising the minimum drinking age to 19 years of age.

The plaintiffs remaining in these two consolidated cases are individuals within the affected age group, parents of such individuals, and liquor licensees. No questions of standing or jurisdiction have been raised by any of the parties with one exception which will be dealt with, *infra*. Although the primary thrust of plaintiffs' attack concerns the Equal Protection Clause of the fourteenth amendment, there are also allegations that the constitutional amendment in question improperly infringes upon the use of alcoholic beverages in connection with religious sacraments, the right to employment, and the rights of parents with regard to their children. There is also a contention raised by the pleadings in *Farrell* but not argued during the trial or briefed that the initiatory procedures for constitutional amendments outlined in the Michigan Constitution of 1963 are themselves unconstitutional. Although the court will address all of these issues in its Opinion, primary attention will be focussed upon the equal protection argument since this is the only issue on which testimony was introduced and was the primary issue insofar as argument of the plaintiffs was concerned.

*Equal Protection:*

The threshold question raised by plaintiffs' equal protection claim is the standard of review which this court should apply to the constitutional amendment initiated and passed by the citizens of the State of Michigan raising the age for buying or consuming alcoholic beverages from 19 to 21 years of age. In connection with that question, a short review of the history of the Equal

Protection Clause of the fourteenth amendment is appropriate in view of the rapid and dramatic development of the fourteenth amendment in the last two decades. Before that, except in the context of racial classifications, the Equal Protection Clause was infrequently invoked and seldom successfully. Indeed, Justice Holmes once remarked that arguments grounded on the Equal Protection Clause were usually "the last resort of constitutional arguments." *Buck v. Bell,* 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1927).

Traditionally, classifications made by units of government would be held valid under the Equal Protection Clause so long as the statute or ordinance reasonably related to the legislative purpose. In that regard, it was a means oriented doctrine and did not seek to second guess or evaluate the merits of the legislative end. Also, considerable flexibility was accorded legislators relative to the vehicle chosen to implement or further the object of the legislation. A leading commentator in the field recently summed up the "old" variety of equal protection scrutiny in these words:

> [T]he courts did not demand a close fit between classification and purpose; perfect congruence between means and ends was not required; judges were prepared to allow legislators considerable flexibility to act on the basis of broadly accurate generalizations and were prepared to tolerate some over-inclusiveness and under-inclusiveness in classification schemes.

*Gunther, Cases and Materials on Constitutional Law,* 657 (9th Ed. 1975).

The deferential "old" equal protection review took on an added measure of permissiveness, at least in the areas of social and economic legislation during the 1960's, somewhat surprisingly given the general philosophical inclination of the Supreme Court during this period. Representative of this hands-off attitude is the often quoted statement of Chief Justice Warren in *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961):

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*Id.* at 425–26, 81 S.Ct. at 1105. This new low in equal protection scrutiny prompted some to characterize the court's analysis as "minimal scrutiny in theory and virtually none in fact." Gunther, *Foreward: In Search of Evolving Doctrine on a Changing Court: A Model For a Newer Equal Protection,* 86 Harv.L.Rev. 1, 8 (1972). In sharp contrast, however, the Warren Court greatly expanded the territories appropriate for so-called "strict scrutiny." Thus, where a classification was based on "suspect" criteria or impacted upon a "fundamental" interest, the legislation was subject to intensive review. Unlike the review associated with traditional equal protection analysis, however, strict scrutiny required the court to look not only to the means but also to the ends the legislature sought to promote. A much closer "congruence" between the means and the ends was required and the court added the requirement that the means be the "least drastic" available, *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *cf. Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *San Antonio School District v. Rodriguez,* 411 U.S. 1, 51, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Moreover, in terms of ends scrutiny, legislation touching upon a fundamental right or derived from a suspect classification was required to be justified by a "compelling" state interest.

Thus, the modern parameters of equal protection analysis began to take shape. All that remained was to identify fundamental interests and ascertain classifica-

tions that were based on suspect characteristics. In the area of fundamental interests, the Warren Court identified voting, *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the right to a transcript in criminal appeals, *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), the right to marry, *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and the right of interstate travel, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). With regard to suspect classifications, however, the Warren Court did not *formally* make notable expansions but, rather, merely hinted *in dicta* that classifications based on things such as illegitimacy or wealth might be suspect. Nevertheless, where a suspect classification such as one based on race was involved, strict scrutiny was always invoked and was almost always fatal to the scheme.

As the personnel on the Supreme Court changed in the late 1960's and early 1970's, so did their analysis relative to equal protection. Thus, while the traditional two-tier approach to equal protection analysis persists, the Burger Court has been reluctant to expand the scope of equal protection beyond that formulated in the Warren era. On the other hand, the Burger Court appears to, although not openly acknowledging it, have essentially taken a "sliding scale," in the words of Justice Marshall, approach to equal protection analysis in some areas.

With regard to the outer extremes of equal protection analysis in the seventies, the Court continues to follow the approaches taken in the Warren era. For example, in *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the Court had occasion to address a purely economic regulation. A New Orleans ordinance had prohibited push cart food sales in the Vieux Carre, or French Quarter, allegedly to protect the aesthetic beauty of the area and preserve its value as a tourist attraction. The ordinance contained a "grandfather provision," however, which exempted push-cart vendors who had operated in the Quarter for eight years or longer. A push-cart operator who had carried on a vending business for approximately two years before the ordinance was passed attacked it on the grounds that the grandfather clause constituted a denial of equal protection. After identifying the ordinance as a purely economic regulation aimed at enhancing the French Quarter as a tourist attraction, the Court reversed the court of appeals—which had found the grandfather provision to have failed the rationality test—and said:

> Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or aliens, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. . . .
>
> In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, see, *e. g., Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423 [72 S.Ct. 405, 96 L.Ed. 469] (1952); in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. See, *e. g., Ferguson v. Skrupa,* 372 U.S. 726, 732 [83 S.Ct. 1028, 10 L.Ed.2d 93] (1963).

*New Orleans v. Dukes, supra,* at 303–04, 96 S.Ct. at 2516. Significantly, the Court also took the occasion to overrule the "only case in the last half century to invalidate a wholly economic regulation solely on equal protection grounds," *id.* at 306, 96 S.Ct. at 2518, on the grounds that it represented a "needlessly intrusive judicial infringement on the State's legislative powers . . . ." *Id.* Other recent examples of the application of deferential equal protection standards include *City of Charlotte v. Local 660, Inter-*

*national Association of Firefighters,* 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976); *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Alexander v. Fioto,* 430 U.S. 634, 97 S.Ct. 1345, 51 L.Ed.2d 694 (1977); and *Matthews v. De Castro,* 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976). In *Hodory,* the Court considered an equal protection attack on an Ohio unemployment compensation scheme that disqualified workers involuntarily unemployed precipitated by a labor dispute at the employer's operations at another site. In applying the passive rational-basis standard of review, the Court noted that that standard of review was "relatively relaxed" and reasserted the proposition that " 'the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.' " *Hodory, supra,* 431 U.S. at 490, 97 S.Ct. at 1909, quoting *Dandridge v. Williams,* 397 U.S. 471, 486, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

*Fioto* involved a federal statute which excluded reserves of the national guard from eligibility for retirement pay if they terminated the service prior to World War II. Plaintiffs attacked the scheme as unconstitutional under the fifth amendment (which although not containing an equal protection clause has been interpreted for all practical purposes as if it did contain the same equal protection clause as the fourteenth amendment) on the grounds that it was totally irrational to exclude reservists with twenty years or more of satisfactory service simply because they had additional years of service before August 16, 1945. Rejecting the attack, the Court found that the statutory exclusion was "unquestionably the product of a deliberate and rational choice." *Fioto, supra,* 430 U.S. at 640, 97 S.Ct. at 1348.

Finally, in *De Castro,* the Court sustained disparate treatment between married and divorced women for purposes of dependency benefits under the Social Security Act. After noting that governmental decisions to expend money in an effort to improve the general public welfare was one within the exclusive province of the legislature, the Court noted that it would sustain classifications of this nature " 'unless the choice [was] clearly wrong, a display of arbitrary power, not an exercise of judgment.' " *De Castro, supra,* 429 U.S. at 185, 97 S.Ct. at 434. The Court also noted and quoted from an earlier case that had established the principle that " '[s]o long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket.' " *De Castro, supra,* at 185, 97 S.Ct. at 434 quoting *Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972).

Also of significance is the fact that in all three of the above cases, the Court was unanimous in upholding the challenged classifications under the rational-basis standard of review. *See also, Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (rejecting an equal protection attack on regulations designed to curb unionizing activities in prisons under the rational-basis standard and emphasizing the broad discretion of prison officials); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 1070, 55 L.Ed.2d 287 (1978) (sustaining a New York requirement of U. S. citizenship for appointment to the state police force notwithstanding the disparate impact on aliens on the grounds that there was "some rational relationship between the interests sought to be protected and the limiting classification.").

In stark contrast, strict scrutiny has been reserved, and indeed limited, to only those situations in which a "fundamental interest" is involved, or a "suspect classification" is used to further a legislative purpose. In 1973, the Court took the opportunity in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), to establish two guiding principles in determining whether a fundamental interest was involved or a suspect classification was being used. In the majority opinion, Justice Powell observed:

> The lesson of these cases in addressing the question now before the Court is

plain. It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is "fundamental" is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education *explicitly or implicitly guaranteed by the Constitution.*

*Rodriguez, supra,* at 33–34, 93 S.Ct. at 1297 (emphasis added).

In terms of finding new classes of individuals or groups that might possess "traditional indicia of suspectness," the Court established the following formula:

[T]he class [must be] saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

*Id.* at 28, 93 S.Ct. at 1294. Given those two rather strict standards for finding new fundamental interests or new suspect classifications invoking strict judicial scrutiny of a particular regulation scheme, it is readily apparent that the expansion of strict scrutiny has been significantly circumscribed. Notwithstanding these relatively rigid guidelines, however, the present Supreme Court has arguably evolved a somewhat elastic range of scrutiny depending upon the interests sought to be protected or the classification system used to further the legislative end.

Some members of the Supreme Court as well as some legal commentators contend that between the two extremes of equal protection scrutiny lies a middle tier or "rational basis with a bite" as Professor Gunther has referred to it. It is necessary to analyze this middle-tier scrutiny since plaintiffs in this case seemingly rely heavily upon cases where the Supreme Court has reviewed statutes, ordinances, and other regulations with a degree of scrutiny arguably inconsistent with the traditional deferential equal protection rational basis review. A close examination of the cases that have invoked an arguably higher standard of review in equal protection cases not involving previously identified fundamental interests or suspect classifications indicates that these cases divide primarily along two lines: (1) classification schemes which use illegitimacy as a basis for discriminating between one group and another; and (2) gender-based discriminations.

In the illegitimacy field, the Court appears to have taken a wavering course in the review of classifications based on that status and while it has invalidated some illegitimacy classifications which would seem capable of surviving deferential standards of the old equal protection standard of review, it has rejected challenges in other cases. On the one hand, we have recent cases such as *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), which have sustained Social Security Act provisions disadvantaging illegitimates, while on the other, we have cases such as *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), which have invalidated classifications based on illegitimacy. In *Trimble,* the Court observed that classifications based on illegitimacy must be " 'carefully attuned to alternative considerations.' " *Id.* at 772, 97 S.Ct. at 1466, quoting *Lucas, supra,* 427 U.S. at 513, 96 S.Ct. 2755. The Court went on to clearly indicate that although it was not scrutinizing the statute as closely as it would if a fundamental interest or a suspect classification was involved, its review would nevertheless not be a "toothless one." *Id.* at 767, 97 S.Ct. 1459, quoting *Lucas, supra,* at 510, 96 S.Ct. 2755. And although the Court applied the "rational-basis" standard of review to this classification system, it nevertheless found that when " 'state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny. . . .' " *Id.* 430 U.S. at 767, 97 S.Ct. at 1463, quoting *Weber v. Casualty & Surety Co.,* 406 U.S. 164, 172, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). Thus, although

the Court used the traditional language of the rational-basis standard of review, its examination of not only the ends but also the means utilized to further those ends clearly manifested a trend toward an intermediate standard of scrutiny in equal protection analysis, more deferential than strict scrutiny, but nevertheless more exacting than the old equal protection standard applied to economic and social welfare legislation.

The emergence of this so-called "middle ground" standard of review in equal protection analysis is more clearly demonstrated in the area of sex discrimination, however. This analysis necessarily begins with an examination of *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). In *Frontiero,* four Justices on the Supreme Court found that gender-based discrimination constituted a suspect classification triggering strict scrutiny. *Frontiero* was a plurality opinion, however, and the four-justice cluster was unable to persuade a fifth justice to join in that finding. The plurality found implicit support for taking the approach it did in its unanimous decision in *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). In *Reed,* plaintiffs challenged the constitutionality of an Idaho statute which provided that when two individuals were entitled to be appointed as administrator for an estate, the male applicant was to be preferred over the female. Chief Justice Burger phrased the issue in these terms:

> [W]hether a difference in the sex of competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced by the operation of [the Idaho law].

*Id.* at 76, 92 S.Ct. at 254. In searching for a standard, the Court looked to a relatively ancient case, *Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920), and revived language in that opinion which had essentially been discarded: "A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a *fair and substantial relation to the object* of the legislation, so

that all persons similarly circumstanced shall be treated alike.'" *Reed, supra,* 404 U.S. at 76, 92 S.Ct. at 254, quoting *Royster, supra,* at 415, 40 S.Ct. 560. Although the Court found some merit in the argument advanced that by eliminating one class of contestants for a letter of administration it furthered the administrative goal of reducing the workload on probate courts, the Court found that "giv[ing] a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by [equal protection]."

Relying heavily on *Reed,* and on an historical analysis of the position of women in our society in juxtaposition to blacks and in contrast to white males, the Court found in *Frontiero* that sex, like race and national origin, was an immutable characteristic determined solely by the action of birth and as such possessing all the characteristics of a classification that was inherently suspect.

In the next few gender-based classifications reviewed by the Supreme Court, however, the Court retreated significantly from the view that sex should be treated as a suspect classification. Nonetheless, the Court did exhibit a pronounced tendency to subject gender-based classification to a higher standard of review. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), is a clear example of this middle-tier scrutiny. In that case, the Court found violative of the Equal Protection Clause, as that concept is contained in the fifth amendment, provisions of the Social Security Act giving benefits based on earnings of a deceased husband and father to both widows and children but giving benefits based on earnings of a deceased wife and mother only to the children. Justice Brennan, author of the *Frontiero* opinion in which sex was viewed as a suspect classification, eschewed a strict scrutiny analysis but invalidated the provisions under the rational basis test as that standard was enunciated in *Reed v. Reed.* Justice Brennan found the classification to be based on "archaic and overbroad generaliza-

tions" that could not be tolerated under the Constitution. Although conceding that there was some logic supporting the position that men were more likely than women to be the primary source of support for their spouses, he rebelled at the thought that any empirical support in that regard could support a gender-based generalization. In connection with Justice Brennan's examination of the question whether the classification scheme rationally furthered the asserted goals of the legislation, the Court found that if the purpose of the legislation was to enable surviving parents to remain at home to care for a child, then a gender-based distinction was entirely irrational.

Interestingly, the most recent significant case embodying this newer, intermediate level of scrutiny is one somewhat similar to the instant case in that it involves alcohol regulation and alleged discrimination on the basis of age and sex. In *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), the Supreme Court invalidated an Oklahoma statute prohibiting the sale of 3.2 percent beer to males under the age of twenty-one and to females under the age of eighteen. After reviewing previous sex discrimination cases, Justice Brennan, who wrote the majority opinion for the Court, set forth a more definitive test for determining whether classification systems grounded on gender considerations could survive equal protection scrutiny: "[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* at 197, 97 S.Ct. at 457. The use of the words "important governmental objectives" as opposed to the traditional phrase that only a legitimate state interest need be present, further exemplifies the emergence of the "newer equal protection." However, the "important governmental objectives" aspect of the new test did not have an impact on the outcome in *Craig.* The court below had found that the interest in traffic safety, which was conceded to be the objective of the legislation by the defendant attorney general, was an important governmental objective and

the Supreme Court did not question this view. The Court, however, found that the statute's classification was not "substantially related" to the goal of traffic safety. Manifesting a highly skeptical attitude toward the use of statistics upon which to justify broad social generalizations, Justice Brennan found insufficient the studies relied upon to establish a high incidence of drunk driving and accidents associated with young males while not so for females. The Court found that among the studies presented, a showing that 2.0 percent of the males but only .18 percent of the females in the affected age group had been arrested for drunk driving was insignificant in terms of the requisite congruence required between the ends and the means to survive constitutional attack.

In contrast to the old, deferential variety of equal protection scrutiny which essentially permitted legislators considerable flexibility in terms of drawing broad generalizations and demanding little more than a minimal fit or congruence between the classifying means and the legislative ends, the Court in *Craig* arguably put legislatures on notice that a substantially closer relationship between the means chosen and the goals sought to be promoted by virtue of those means would be required in the future, at least where "quasi-suspect" or "quasi-fundamental" rights were affected. Justice Powell, who joined the majority but expressed his concern over establishing a middle ground of scrutiny in equal protection analysis nevertheless conceded that prior sex discrimination cases had made it clear that the Court would subject such classifications to a more demanding examination than that the Court utilized in reviewing classifications seeking to promote broad economic or social welfare goals.

The other aspect of the "newer equal protection" that needs to be reviewed before specifically addressing the instant case and attempting to ascertain the appropriate level of scrutiny is the question whether there must be an "articulated" purpose from which the rational basis of legislative action may be ascertained. That is to say,

the classic deferential equal protection approach to analyzing constitutional attacks upon statutory schemes was to uphold a statutory discrimination "if any state of facts reasonably [could] be conceived to justify it." *McGowan, supra,* 366 U.S. at 426, 81 S.Ct. at 1105. It has been suggested that "extreme deference to imaginable supporting facts and conceivable legislative purposes" was the hallmark of traditional equal protection analysis. Gunther, *Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 21 (1972). With the advent of the as yet not formally recognized intermediate or sliding scale approach to equal protection analysis at least in areas that touch on quasi-suspect categories, the Court began to speak in terms of actual legislative purposes, having their genesis in materials offered to the Court as opposed to "resorting to rationalizations created by perfunctory judicial hypothesizing." *Id.*

The articulated state purpose doctrine appears to have been originated by Justice Powell in *McGinnis v. Royster,* 410 U.S. 263, 271, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). Prior to that, the Court only hinted or by negative implication suggested that it would not use its judicial imagination to perceive possible justifying rationale. It required that the state objective be "non-illusory" and that the Court would supply "no imaginary basis or purpose" for a particular statutory scheme. While the insertion of the requirement that the state have an articulated purpose has been sporadic at best, its frequency of appearance in the modern cases seems to be increasing. *See, e. g., New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (finding that legislation rationally promoted the objective identified); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) ("classification rationally [promotes] the purpose identified by the State."). But see *Holt Civic Club v. City of Tuscaloosa,* —— U.S. ——, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978).

To summarize, the requirement that the state have an articulated purpose for enacting particular legislation seems to be a characteristic of the newer equal protection analysis used when state statutory classifications involve important personal rights or classify on the basis of quasi-suspect classifications. As will be pointed out, *infra,* this court finds no such rights or quasi-suspect classifications to be involved in this litigation.

With this historical background then, this court can proceed to determine by what standard the constitutional amendment under attack is to be judged.

■ The first issue that by necessity has to be discussed in connection with arriving at the appropriate standard of review is whether "strict scrutiny" is appropriate. It was suggested in opening statements that, although there was no case law supporting the position, the court should give some consideration to reviewing this constitutional amendment under the rigorous, strict scrutiny standard of equal protection review. As previously stated, strict scrutiny is only appropriate when persons are classified according to "suspect" criteria or a "fundamental interest" is involved or affected by the classification scheme. If the intensive review associated with strict scrutiny were required in this case, the court would not only have to find a compelling societal or state interest justifying the Michigan constitutional amendment, but the defendants would also have to demonstrate that the amendment was necessary to promote that interest and, further, that the means used to promote that interest were reasonably related to the goal of the legislature and that there were no other alternative ways to protect the interest. E. g., *Dunn v. Bloomstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

■ The analysis must begin then with a consideration of whether the right to access to alcohol is a "fundamental" interest. For guidance, the court would first turn to the standards enunciated in *San Antonio Independent School District v. Rodriguez, supra,* and ask whether the right to drink alcohol is implicitly or explicitly guaranteed by the

United States Constitution. It becomes quickly apparent that it is not; and it further appears that the twenty-first amendment to the United States Constitution explicitly or implicitly denies to an individual the claim that the right to drink alcohol is a fundamental right. *Republican College Council of Pennsylvania v. Winner,* 357 F.Supp. 739, 740 (E.D.Pa.1973); *Houser v. State,* 85 Wash.2d 803, 540 P.2d 412, 414 (1975) (en banc); *cf. California v. LaRue,* 409 U.S. 109, 114, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972).

■ If a fundamental right is not involved, then the court must find that a "suspect classification," as that term of art has been utilized by the United States Supreme Court, is involved to invoke the extremely close judicial scrutiny associated with the strict scrutiny standard of review. The court believes that it is clear beyond doubt that this amendment to the Michigan Constitution classifies people into groups on the basis of age, and age alone. Until recently, this question might have presented the court with a difficult task in ascertaining whether classifications drawn on the basis of age should be embraced within those kinds of cases that invoke strict judicial scrutiny. However, the United States Supreme Court has recently addressed this point directly in *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). In *Murgia,* the Supreme Court upheld the validity of a state law requiring state police officers to retire at the age of fifty. A three-judge district court had struck down the statute under a rational basis theory of equal protection review. The Supreme Court reversed, after finding that a rational-basis standard of review was appropriate, and found that since physical capabilities necessarily decline with age, mandatory retirement at age fifty was at least rationally related to the state's interest in maintaining a physically fit police force.

For purposes of this case, it is particularly appropriate to note and quote several significant passages from that per curiam opinion:

While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a "history of purposeful unequal treatment" or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities. The class subject to the compulsory retirement feature of the Massachusetts statute consists of uniformed state police officers over the age of fifty. It cannot be said to discriminate only against the elderly. Rather, it draws the line at a certain age in middle life. But even old age does not define a "discreet and insular" group. *United States v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4 [58 S.Ct. 778, 82 L.Ed. 1234] (1938), in need of "extraordinary protection from the majoritarian political process." Instead, it marks a stage that each of us will reach if we live out our normal span. Even if the statute could be said to impose a penalty upon a class defined as the aged, it would not impose a distinction sufficiently akin to those classifications that we have found suspect to call for strict judicial scrutiny.

*Murgia, supra,* at 314–15, 96 S.Ct., at 2567.

The Court next turned to an examination of the age classification under the rational-basis standard. Significantly, the Court found that the Massachusetts statute clearly met the requirements of the Equal Protection Clause and in so doing merely said that "the State's classification *rationally furthers the purpose* identified by the State . . . ." *Id.* at 314, 96 S.Ct. at 2567. Notwithstanding assertions that it would be relatively easy, in view of the regular physical examinations officers were required to undertake, to make an individual determination in each instance whether the officer was physically fit to assume the duties of a police officer, the Court held that presuming officers reaching the age of fifty to be physically unfit was not a scheme that the Court could characterize as wholly unrelat-

ed to the objective of the statute. Acknowledging that the "State perhaps [had] not chosen the best means to accomplish [its] purpose," *id.* at 316, 96 S.Ct. at 2568, the Court nonetheless emphatically held that where "rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.'" *Id.,* quoting *Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. 1153. The Court concluded its discussion with the following passage:

> "But '(w)e do not decide today that the (Massachusetts statute) is wise, that it fulfills the relevant social and economic objectives that (Massachusetts) might ideally espouse, or that a more just humane system could not be devised.' . .
> We decide only that the system enacted by the Massachusetts Legislature does not deny appellee equal protection of the laws."

*Murgia, supra,* 427 U.S. at 317, 96 S.Ct. at 2568.

In this regard, it is interesting to note that while discrimination against the elderly at a particular age imposes a disability that is never removed, drawing lines that affect young people has only a temporary effect. In other words, we are not involved with an absolute prohibition in any sense of the word but merely a postponement of the right to drink until age 21.

Several other decisions which deal with age-based classifications are also relevant and offer the court substantial guidance in determining how strictly it must scrutinize this constitutional amendment in the equal protection context.

The first case the court would look to is *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), where a majority of the Supreme Court refused to uphold a congressional statute designed to reduce the age of voting in state elections from twenty-one to eighteen.

The Court invalidated an act of Congress which reduced the voting age from twenty-one to eighteen years in state and federal elections. Although the federal election aspect of the statute was sustained, the Court rejected congressional attempts to establish the age for voting in state elections. *Oregon* is a significant Supreme Court ruling insofar as it indicates the Court's attitude on the question whether the states retained the power to control this aspect of their internal affairs.

The next case to arise in this context, and one which is important to an analysis in the instant case, is *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). In *Stanton,* a divorced wife sued for child support payments due under a divorce decree when the divorced husband stopped payments for his daughter when she reached the age of eighteen. The agreement did not specify when support payments would cease, but under Utah law, females attained the age of majority at eighteen, while males reached the age of majority at twenty-one. In striking down this gender-based classification, Justice Blackmun could find no rationale for imposing upon the defendant liability for support payments for his daughter only to age eighteen while he was required to make support payments for his son until he reached the age of twenty-one. The significance this case holds for the instant dispute, however, lies in the closing paragraphs of the Opinion. Having found that the classification denied equal protection of the laws, the Court went on to find that it was not appropriate for it to determine what the appropriate age of majority should be for both males and females. The defendant claimed that the unconstitutional inequity between the treatment of males and females in this regard should be resolved by reducing the age of majority for both to 18 rather than raising the age of majority for women to 21. Responding, the Court said: "This plainly is an issue of state law to be resolved by the Utah courts on remand . . . ." *Id.* at 18, 95 S.Ct. at 1379.

Following remand, the Utah trial court set the age of majority for persons of both sexes at 21. But upon review by the Utah Supreme Court, it reversed and insisted that since the only person before it was a female, it could not change the age of ma-

jority for males and refused to raise the age of majority for females to 21 so as to put it in congruence with the male age of majority. A second appeal was taken to the United States Supreme Court which in no uncertain terms remanded the case to the Utah Supreme Court and said that its disposition of it had been "obviously inconsistent with the U. S. Supreme Court's earlier ruling. The Court added:

> We, of course, do not decide how Utah was to eliminate the discrimination between the genders, and thereby to determine at what age the appellee's duty to support his daughter terminated. Instead, we remanded the case to the Utah court for it to resolve this issue of state law.

\* \* \* \* \* \*

The thrust of *Stanton I*, and therefore the starting point for the Utah court on remand, was that males and females cannot be treated differently for child support purposes consistently with the Equal Protection Clause of the United States Constitution. *Cf. Craig v. Boren*, 429 U.S. 190, [97 S.Ct. 451, 50 L.Ed.2d 397] (1976). Apparently the Utah Supreme Court did not read our opinion as requiring that the child support law must be nondiscriminatory to comply with the constitutional standard. That, of course, is a misunderstanding.

*Stanton v. Stanton*, 429 U.S. 501, 97 S.Ct. 717, 50 L.Ed.2d 723 (1976). The Court also added the following very important footnote:

> As we did in *Stanton I*, we emphasized that Utah is free to adopt either eighteen or twenty-one as the age of majority for both males and females for child support purposes. The only constraint on its power to choose is the principle set out in *Stanton I*, and reiterated here, that the two sexes must be treated equally. . . [T]he Utah court might elect to adopt age twenty-one as the age of majority . . [or] treat both males and females as adults at the younger age. By suggesting these two options, we do not mean to exhaust all other possibilities; we simply mention them to illustrate the fact that our opinion leaves open this *state-law* issue for the state courts to decide.

*Id.* at 504 n. 4, 97 S.Ct. at 719 (emphasis added).

 What the immediately foregoing cases clearly establish is that age, especially at the lower end of the spectrum, is not a suspect classification nor does it seem to possess any of the traits often associated with suspect classes. *See, generally, Karst, Foreword: Equal Citizenship Under the Fourteenth Amendment*, 91 Harv.L.Rev. 1 (1977) (addressing in detail those qualities and factors that courts must consider in determining whether a particular classification should be suspect or indeed should invoke a higher level of scrutiny than that associated with the traditional rational-basis standard of review). It also becomes clear that the matter of determining age for purposes of the age of majority is an issue of state law, not involving federal constitutional principles. As such, it persuades this court that the appropriate standard of review it must utilize in examining the initiative at issue in this case is the traditional rational basis standard of review as applied by the United States Supreme Court in cases which include *McGowan v. Maryland, supra*, and *New Orleans v. Dukes, supra*. The court believes, however, that even if it were to adopt a more demanding posture in this regard, the constitutional initiative attacked in this case would still survive judicial scrutiny. Therefore, the court will take a conservative approach and will analyze the facts as they relate to the Equal Protection Clause of the fourteenth amendment under a somewhat more demanding standard of review than the court believes necessary.

 Under either the traditional approach to equal protection analysis or under a more demanding middle-tier scrutiny, the court first has to presume that the action of a legislature or an electorate exercising its initiatory powers to legislate is valid. *See, e. g., San Antonio School District v. Rodriguez*, 411 U.S. 1, 40–41, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Madden v. Kentucky*,

309 U.S. 83, 88, 60 S.Ct. 406, 84 L.Ed. 590 (1940); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369 (1911); *Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. at 314, 96 S.Ct. 2562. In passing upon legislation adopted as a result of the power of initiative, the courts have never specifically and directly addressed the question whether the same presumption of constitutionality attaches to the actions of the electorate as to the actions of the legislature. Nevertheless, what scanty authority there is does suggest that the constitutionality of this initiatory amendment should be assessed as though it were enacted by the legislature. *See Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Hunter v. Erikson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971); and *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). An interesting analysis of the use or misuse of initiatory powers can be found in Sager, *Insular Majorities Unabated: Warth v. Seldin and City of Eastlake v. Forest City Enterprises, Inc.,* 91 Harv.L.Rev. 1373 (1978). It is this article on which the plaintiffs in *Farrell* largely premise their Count VII argument. Even were the court to adopt the view propounded by Professor Sager in the aforementioned law review article, however, the court would still conclude that a presumption of constitutionality was still in order in this case. First, Sager's views, by his own admission, do not comport with the law as it exists today. Second, the court feels that any lesser deference accorded to the initiative process would deprecate not only concerns for federalism and the concomitant respect for state governments and their functions, but also the important residuary power of the electorate to legislate.

Even if the court were to accord greater scrutiny to an initiative as opposed to a legislative act as a general proposition, the court believes that the decision in *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), would compel the court to give great deference to the presumption of validity when considering state liquor regulations in view of the twenty-first amendment's impact on the states vis-a-vis their control over liquor.

The twenty-first amendment repealed the eighteenth amendment in 1933. In the first case to consider the scope of state power over liquor regulations, Justice Brandeis summarily dismissed equal protection arguments in these words: "A classification recognized by the Twenty-first Amendment cannot be deemed forbidden by the Fourteenth." *State Board of Equalization v. Young's Market Company,* 299 U.S. 59, 64, 57 S.Ct. 77, 79, 81 L.Ed. 38 (1936). Subsequent cases followed *Young* in blind allegiance and adhered to a literal reading of section 2 of the amendment, recognizing broad power over the control of liquor by the states.

A few years later, however, the Court retreated somewhat and suggested that the state's power to regulate liquor was not unlimited relative to controlling liquor within its borders. For example, in *Ziffrin, Inc. v. Reeves,* 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939), the Court indicated that state liquor laws must conform to the demands of the Equal Protection Clause, a view previously rejected almost out of hand. After a flurry of cases in which only the Commerce Clause was at issue, the Court considered an equal protection and Commerce Clause attack on New York statutes that required brand owners of liquor or their agents to file monthly price schedules for sales to wholesalers and retailers. The laws further required that the price schedules be accompanied by an affirmation that the price of the liquor was not higher than the lowest price at which sales were made anywhere else in the United States during the preceding month. With regard to the equal protection aspect, the Court applied traditional equal protection principles without discussion as to whether the amendment could preclude or temper such consideration. Thus, although *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), upheld the statutes, it did serve to indicate that the states were not totally immune to equal

protection challenges as Justice Brandeis had earlier asserted.

The pendulum swung back in the other direction, however, in *California v. LaRue, supra.* The California Department of Alcohol Beverage Control had promulgated rules that prohibited certain kinds of sexually suggestive or nude entertainment. A three-judge district court held that substantial portions of the regulations were unconstitutional under the first and fourteenth amendments. In very broad, sweeping language, the Supreme Court reversed. Justice Rehnquist first observed that "[w]hile the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power, the broad sweep of the Twenty-first Amendment has been recognized as conferring something more than the normal state authority over public health, welfare, and morals." *Id.* 409 U.S. at 114, 93 S.Ct. at 395. He added that the "case for upholding state regulation in the area covered by the Twenty-first Amendment is undoubtedly strengthened by that enactment . . ." *Id.* at 115, 93 S.Ct. at 395. As a result of the "added presumption in favor of the validity of the state regulation in this area that the Twenty-first Amendment requires," *Id.* at 119, 93 S.Ct. at 397, the Court had little trouble in finding

> [that it] would poorly serve both the interests for which the State may validly seek vindication and the interests protected by the First and Fourteenth Amendments were we to insist that the sort of bacchanalian revelries that the Department sought to prevent by these liquor regulations were the constitutional equivalent of a performance by a scantily clad ballet troupe in a theater.

*Id.* at 118, 93 S.Ct. at 397.

*LaRue* has been the subject of criticism due to its sweeping language but it is still the law, at least on its facts, as evidenced by the Supreme Court's recent denial of certiorari in a case in which a federal district court refused to enjoin the suspension of a bar owner's license for violations of the provisions challenged in *LaRue*. *Richter v. Department of Alcohol Beverage Control of California,* 559 F.2d 1168 (9th Cir. 1977), cert. denied, 434 U.S. 1046, 98 S.Ct. 891, 54 L.Ed.2d 797 (1978).

*LaRue* appears to have been narrowed however, by *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Justice Brennan, writing for the majority, said:

> It is true that *California v. LaRue* . . . relied upon the Twenty-first Amendment to 'strengthen' the State's authority to regulate live entertainment at establishments licensed to dispense liquor, at least when the performances 'partake more of gross sexuality than of communication,' *id.*, [409 U.S.] at 118, [93 S.Ct. 390]. Nevertheless, the Court has never recognized sufficient 'strength' in the Amendment to defeat an otherwise established claim of invidious discrimination in violation of the Equal Protection Clause.

*Craig, supra,* at 207, 97 S.Ct., at 462. Thus, it would appear that *LaRue* has been limited, and that the Court re-adopted its view in *Seagram* that the Twenty-first Amendment has not emasculated the Equal Protection Clause as it relates to state liquor regulatory schemes "perceived as invidious." *Id.* at 208, 97 S.Ct. 451. Nonetheless, this court finds that, even as narrowed, *LaRue* makes it crystal clear that a strong presumption of validity should attach to state legislative enactments involving the police power regulation of alcohol regardless of whether such enactments originate with the legislature or the electorate. See also *Blatnik Co. v. Ketola,* 587 F.2d 379 (8th Cir. 1978).

Having thus concluded that the consumption of alcoholic beverages is not a fundamental right and that age is not a suspect classification, it is clear that this constitutional amendment must only pass muster under the "rational relationship" standard enunciated by the Supreme Court. The court has also concluded that this police power measure is entitled to a presumption of validity premised upon the traditional approach taken when considering legislative

enactments and additionally buttressed by the grant of power given to states in the twenty-first amendment. The only question remaining then is whether the evidence presented in fact supports the contention that there is a rational basis between the classification and the purposes of the amendment. Again, a threshold question must be examined, however. The parties are in dispute as to the exact purpose of the amendment that the court should look to in determining whether there is an underlying rational basis for the classification. It is the plaintiffs' contention that the court must look to only the "articulated purpose" of the amendment and that the only articulated purpose was traffic safety. The defendants' answer to this contention is twofold: First, they contend that the court is not bound to look only to the articulated purpose but may in the area of liquor regulations look to other rational bases that may be apparent for the classification. The state also contends that even if the court decides that it must look to the articulated basis and find that the only articulated basis is traffic safety that nonetheless the rational relationship required exists.

■ As indicated, *supra*, there is language in recent cases to indicate that the court looks with more disfavor than it did historically on *post-hoc* rationalization by the judiciary insofar as determining rational relationships are concerned. Notwithstanding this fact, however, this court knows of no case in which the Supreme Court has held that the court can only look to the specific articulated purpose particularly when dealing with non-suspect classifications and other than fundamental rights. In fact, the most recent pronouncement from the Supreme Court in the equal rights area, *Califano v. Aznavorian*, —— U.S. ——, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978), involving a challenge to certain social security amendments clearly demonstrates that Justice Stewart furnishes considerable *post-hoc* rationalization for the challenged legislation. *See also Holt Civic Club v. City of Tuscaloosa*, —— U.S. ——, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). In this regard, the court also finds appropriate a quotation from Justice Linde's recent article in which he severely criticized those decisions by the Supreme Court in which legislation passed by a state legislature or the Congress has been struck down on either due process or equal protection grounds. Dealing specifically with the question whether articulated reasons are necessary or even appropriate to consider in the context of constitutional adjudication, Justice Linde wrote:

> Articulated reasons have their place in an agency's pursuit of the goals assigned to it. Pursued into the legislative process, the hope for candor is much more likely to produce hypocrisy. Recitals of findings and · purposes are the task of anonymous draftsmen, committee staffs and counsel for interested parties not legislators. Such recitals will be an attempt to provide whatever under prevailing case law is expected to satisfy a court. Except for this purpose, a legislator has no reason to care about them nor to dispute their truth or relevance so long as he favors the bill.

Linde, *Due Process of Law Making*, 55 Neb. L.Rev. 197, 231 (1976). Although not necessary to the court's decision in this matter, this court finds the reasoning of Justice Linde above referenced to be persuasive.

There is also a very real factual question as to whether there is indeed only one articulated purpose for the constitutional amendment under attack. Plaintiffs premise their contention in this regard on a number of exhibits indicating that Coalition 21, the group that sponsored the amendment, used a traffic safety theme in promoting the amendment with the general public. There is no doubt that this in fact occurred and that the traffic safety drum was the one most frequently beaten. It is also undeniable, however, that other groups besides Coalition 21 endorsed, supported, and publicized their support on grounds broader than traffic safety. This is best illustrated by the testimony in this record of Dr. Zako, the council chairman for the Michigan State Medical Society (MSMS), an organization of doctors within the State of

Michigan. Dr. Zako testified that of the 12,000 M.D.'s in the state, approximately 9,000 are members of the MSMS. When the constitutional amendment in question was being placed before the electorate, the MSMS took a position in support of the amendment and not only endorsed it but contributed funds to aid in its passage. Dr. Zako also testified that the reasons that the MSMS supported this constitutional amendment were much broader than just traffic safety. Dr. Zako testified, for example, that the body makeup of individuals in their late teens is such that there is a ratio of muscle tissue to fat in the body not found in older adults. This results in a more rapid metabolism of alcohol and alcohol having a greater affect on young persons in this age group. The doctor also testified, as did other witnesses, that there is no doubt that alcohol is the number one drug of abuse in the United States and that there was a salutory effect in keeping young people from being introduced to alcohol any sooner than necessary. Additionally, Dr. Zako indicated that this period in young persons lives was one of emotional and psychological instability and that in these transition years alcohol had a serious effect more pronounced than on older adults. He readily admitted that any age line that he would draw would be to some degree arbitrary, but indicated his group supported the constitutional amendment because that in fact is where the age line was drawn in the amendment and that it was reasonable insofar as the MSMS was concerned from a medical standpoint.

■ The testimony of Dr. Zako alone is sufficient to resolve the contention against the plaintiffs that there was only one articulated basis for this constitutional amendment. However, the conclusion reached in this regard is only incidental to this court's holding since, as will be indicated *infra*, the court finds that the testimony and other exhibits introduced into evidence provided a rational relationship for the classification even if the only purpose the court could look to was traffic safety. An analysis of the testimony on this issue of traffic safety is now in order.

Before discussing the testimony in detail, it is important to first observe that, although several experts testified in this case, this was not a battle of the experts in any traditional sense. All of the experts who testified were in substantial agreement and it is only the legal conclusions that the parties ask the court to draw from the testimony that are in dispute. It is helpful at this point to further analyze the arguments of the plaintiffs in this regard.

In essence, plaintiffs' argument is that the classification is unfair because after the drinking age was lowered to 18 from 21, the traffic accidents and fatality records of those in the 18 to 20 group, although dramatically increased, were nonetheless consistent with similar records compiled by those in the 21 to 24 age group. Stated another way, the plaintiffs have premised almost their entire equal protection case on the proposition that the state may not look to the rise in drinking related accidents and fatalities of those in the 18 to 20 age group, but must instead merely compare their driving record with their older peers'. All of the experts who testified agreed that the drinking/driving accident and fatality rate of the 18 to 20 year old group was approximately the same as that of the 21 to 24 year old group. All similarly agreed that there was an extremely significant increase in the fatality and drinking related accident statistics for the 18 to 20 group after the drinking age was lowered. Because of the theory that plaintiffs were relying on, they were also extremely careful in how they questioned their own experts. The ultimate question which they would pose to the experts they called was whether they felt that there was any rational basis for distinguishing the drinking/driving records of the 18 to 20 year old group and the 21 to 24 year old group. Plaintiffs' experts uniformly answered this question "No." With one exception, however, the plaintiffs stayed away from asking the question whether returning the drinking age to 21 would lessen the drinking accident and fatality rate for those in the 18 to 20 year old age group. To the one expert that this question was

posed, Dr. Clay, the reply given was that she did not believe that the raised drinking age would make any difference because the "kids would drink anyway." In addition to having no empirical support for this conclusion, those testifying for the defendant rejected this reasoning and felt that the matter of whether drinking was illegal did have a significant influence on drinking patterns.

Although plaintiffs' experts did not reject or refute the statistical evidence introduced primarily through the defendants' expert, Dr. Douglass, the court feels nonetheless compelled to comment at some length with reference to Dr. Douglass' testimony. The court feels constrained to make these comments and findings in light of the admonition contained in *Craig v. Boren* where the court stated, 429 U.S. at page 208–09, 97 S.Ct. at page 462:

> Even when state officials have positive sociological or empirical justification for these gender-based differentiations, the courts have struck down discriminations aimed at an entire class under the guise of alcohol regulation. In fact, social science studies that have uncovered quantifiable differences in drinking tendencies dividing along both racial and ethnic lines strongly suggest the need for application of the Equal Protection Clause in preventing discriminatory treatment that almost certainly would be perceived as invidious. In sum, the principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured *but loose-fitting generalities* concerning the drinking tendencies of aggregate groups.

(Emphasis added). Earlier in the opinion, the *Craig* Court explained that "the statistics exhibit a variety of other shortcomings that seriously impugn their value to equal protection analysis . . . [including] obvious methodological problems." 429 U.S. at 202, 97 S.Ct. at 459. In an accompanying footnote, the Court added, "the Oklahoma surveys . . . are lacking in controls necessary for appraisal of the actual effectiveness of the male . . . prohibition." 429 U.S. at 202 n. 14, 97 S.Ct. at 459.

In striking contrast to the testimony offered in the *Craig* case is that offered in the instant case primarily through the testimony of Richard Lee Douglass. Dr. Douglass, who testified for the defendants, holds his Ph.D. Degree in public health administration, is involved in a number of capacities with the U.S. Public Health Service, and currently holds a research appointment at the University of Michigan. Additionally, he has served on the faculty for the School of Social Work and has taught extensively in the area of quantitative methods and program evaluation. He is also appointed at the Highway Safety Research Institute and has done extensive research on alcohol related problems. The transcript of the testimony must be referred to to really do complete justice to Dr. Douglass' qualifications insofar as they relate specifically to the area under discussion in this case.

Equally significant is the fact that in *Craig* as in so many cases, the statistics that were used were statistics compiled primarily for other purposes and were then adapted for use in the litigation. The statistics relied upon by Dr. Douglass, however, are statistics gleaned from studies that were commissioned for the express purpose of examining the immediate and long-range effects of lowering the Michigan drinking age on the state's highway traffic safety.

The Douglass studies were commissioned first by the United States Department of Transportation and then by the Michigan Office of Substance Abuse Services.

Dr. Douglass' first study, which was funded by the National Highway Traffic Safety Administration, stemmed from a congressional interest in the effects that allowing eighteen year olds to purchase and consume alcohol had on national traffic safety statistics. Congress had noted that, as a consequence of the twenty-sixth amendment to the United States Constitution, several states had enacted laws allowing 18 and 19 year olds to purchase and consume alcoholic beverages. Bids were solicited for the project and, after congressional consideration, Dr. Douglass' group

was awarded the contract because his group ranked first in technical merit among those who bid for the job. The objectives of the study were twofold:

(1) To determine if alcohol-related highway crashes increased after the lowering of the drinking age; and

(2) To determine, if changes were found in the frequencies and rates of alcohol-related crashes, whether a *causal relationship* exists between the crash experience increases and lowered drinking ages.

Well aware that the methodology is always a major concern of analysis, Dr. Douglass took extensive measures to insure that whatever trends or changes were found could be related to the lowered drinking age and not some other phenomena. Control factors were designed which, collectively, isolated the lowered drinking age as the only factor that explained any variation in the post-change statistics for the affected group. The premium placed on controlling irrelevant factors was evident at each step of the study. At the outset, the group determined that data should be collected from appropriate police or traffic safety agencies in seven states. The states selected represented two long-term 18 year old drinking law states—New York and Louisiana; two long-term 21 year old drinking law states—Pennsylvania and Texas; and three states, Michigan, Vermont and Maine, whose legal drinking age had been lowered within the same six-month period in 1972. Michigan, Vermont and Maine were thus the states under study with the other four states serving as controls. If a particular statistical change occurred consistently in all seven states, the study could conclude that the change had not been caused by the drinking age within the three experimental states. This first control factor, therefore, resulted in the study examining over six million police reported automobile crashes.

To meaningly compare data reflecting pre-change time periods with data on accidents that had occurred during the eighteen-month post-change period, the study also had to adopt control measures for population growth and seasonal factors, and to contrast different age groups. It was also essential to identify and analyze a particular input contained in all the reports studied, and that one input was the investigating officer's opinion as to whether any of the drivers involved had been drinking. The "had been drinking" (HBD) information was reported, albeit in various ways, on each of the reports collected from each state. However, tremendous opportunity for subjectivity by the investigating officers whose reports constituted the aggregate of the available data, caused an absence of a consistent criteria among the base data, and had to be neutralized. Thus, in an effort to mitigate the amount of natural subjectivity, or alternatively, to increase the objectivity of the results, Dr. Douglass, with the cooperation of Dr. Jairus Flora (one of plaintiffs' experts), formulated a control for the HBD statistics called the three-factor surrogate (three-FS). The three-FS involved identifying a subset from all reported accidents studied, which subset would have a consistent level of reliability and validity over time periods and among different age groups. The study initially had revealed that alcohol-related accidents are remarkably predictable and also that there was one type of accident statistically consistent in frequency in all states studied. The accidents involved: a male driver (factor one); a single vehicle (factor two), and occurring between 9:00 PM and 6:00 AM (factor three).

Thus, any significant increase in accidents in this group would be free from the problems involved with the total mass of statistics and subject to analysis for causal factors.

A third control employed by the Douglass group was, as Dr. Douglass testified, a time-series decomposition analysis. Dr. Douglass explained that official accident records of the type used in the research represented a class of data unique in the area of statistical analysis because those records are the results of consecutive additions over long periods of time rather than samples from a single point in time. Thus, the measurement cannot be assumed to be

independent of each other, and an analysis of time-series data requires an understanding of the composition and peculiarities of time-ordered running records. To accommodate for this, Dr. Douglass' group chose monthly increments as the units of analysis for all reported-drive crash involvements. Then, by plotting the results, a linear trend could be gleaned that would reflect regular occurrences, seasonal affects, and the probable affects that an independent phenomenon occurring during the month had on the monthly result. The study could then isolate the results of an unexpected occurrence, such as a change in the legal drinking age, which would not have been predictable by trend and seasonal cycle analysis.

After formulating this sophisticated system, which has only been roughly outlined in this Opinion, the study's approach was to chart the linear progression of alcohol-related crashes among 18 to 20 year olds, from 1968 through 1971. Then, by calculating the variation from the expected linear progression, the study could determine the effects of the change in the law. Cumulatively, the controls, such as the control states and the three-factor surrogate, would help to ensure that the changes from the predicted lineal progressions were not caused by outside factors. Because of the study's emphasis on controls, the lowered drinking age factor was isolated as the only independent, dissimilar factor.

The initial study, reported in 1974, revealed that Michigan experienced a frequency increase in alcohol-related traffic crashes, conservatively estimated to be between 9.99 percent and 25.66 percent for the first twelve to eighteen months subsequent to January 1, 1972, among the 18 to 20 year old drivers and a significant increase in fatal crashes in this age group. The increases in alcohol-related traffic accidents were statistically and socially significant.

The 1973–1974 Douglass study, conducted at the Highway Safety Research Institute at the University of Michigan, demonstrated an immediate impact resulting from the lowered drinking age on youth crash involvement. At least two research questions, however, were generated by the investigation. First, was the initial increase in alcohol-related crashes temporary or permanent? Second, what intervening factors might help explain the relationship between the change in legal drinking age and the consequent increase in alcohol-related casualties? These unresolved issues helped to provide the predicate for Dr. Douglass undertaking his second study which was limited to the State of Michigan, and which was funded by the Michigan Office of Substance Abuse Services.

Dr. Douglass' study, entitled "Alcohol Availability and Alcohol-Related Casualties in Michigan, 1968 through 1976", (DX C & G) was designed in part to determine the effects of the 18 year old drinking age on traffic crash frequencies and rates for 18 to 21 year old drinking drivers during the first four years of the Michigan law's existence. In addition to using the HBD and three-FS, the study constructed a working model which interrelated several key factors involved in the creation of alcohol-related social costs. The highlighted elements of this model include public policy considerations, enforcement compliance considerations, retail dynamics, alcohol availability, consumption, the affects of consumption, and what it terms as other influences. By using the multiple-interrupted time-series analysis of Michigan State Police crash data, the study attempted to determine whether the initial increases of crash involvement due to the 1972 change in legal drinking age from 21 to 18 persisted or if the impact, which was initially measured in 1973, was temporary. Once again, the analyses of traffic crash data involved controlling for long-term linear trends associated with population and economic growth and for seasonal cycles. The study removed these values from the monthly frequency measures and was able to isolate a residual which is most likely to reflect impacts of changes in laws or other non-routine influences on the frequency of accidents.

Part of the study was a controlled, multiple-time series analyses for a 20 percent random sample of Michigan crashes. The results of that test, for purposes of this Opinion, sufficiently demonstrate the impact of the change in the Michigan drinking age on 18 to 20 year olds. In regard to residual deviations from predicted frequencies, the state-wide increase from 1972 through 1975 in residual, or statistically unanticipated, alcohol-related crashes among 18 to 20 year olds was 16.61 percent by the three-FS rate and 34.61 percent for the HBD rate. As Dr. Douglass testified, this reflects an exceptionally conservative analysis of the three-FS rate, which when translated, indicates an estimated 4,800 alcohol related crashes among the affected group during the first 48 months of the lowered drinking age. This represents the estimated minimum impact of the lowered drinking age on the 18 to 20 year olds with respect to alcohol-related crashes. The HBD rate, on the other hand, represents what was determined to be the maximum impact. Additionally, no other age group had a measurable "residual impact" with the three-FS rate of alcohol involvements.

With regard to the most distressing subset of the study's results, to wit, fatal alcohol related accidents, both the HBD rate and the three-FS rate indicate that the fatal alcohol-related accidents among 18 to 20 year olds increased by over 26 percent, or by 89 accidents in which one or more deaths occurred. Once again, no other age group had a similar measurable "residual impact" in this category.

The methodology and controls used by Dr. Douglass were not only precise and exacting, but plaintiffs' experts indicated that they felt they could not criticize in any way the methodology. In addition, Dr. Douglass testified that the only criticism that he had received after his study was completed was that he had been too cautious and that his estimates were too conservative.

■ The court is thus left with an impressive and unrefuted body of statistical data which graphically demonstrates the permanent and significant increase in alcohol-related traffic accidents and fatalities affecting the 18 to 21 year old group after the Michigan drinking age was lowered to age 18. This data supports the finding of a rational basis for a classification comprised of 18, 19 and 20 year olds. It is true that if the electorate or the legislature wanted to further impact the area of drinking related traffic accidents and fatalities, that they could also justify from a statistical standpoint prohibiting those in the 21 to 24 age group from drinking. That they have chosen not to do so, however, does not mean that the classification as drawn violates the Equal Protection Clause of the Constitution.

This leads to the only remaining related argument of the plaintiffs. It is contended by the plaintiffs that because the age of majority was lowered in the State of Michigan to 18 in the year 1971, that drinking is a privilege of this lowered age of majority and that the state cannot now again raise the drinking age, having committed itself to a lower age of majority.

It is interesting to note that the so-called Age of Majority Act of 1971 is not actually entitled that at all—said title being editorially supplied. See M.C.L.A. 722.52, being P.A.1971, No. 79.

The Act specifically listed those statutes superseded or amended which included 1933 Extra Session P.A. 8 which established the legal drinking age at 21. When the legislature by 1978 P.A. 94 raised the drinking age to 19, they did not amend the so-called Age of Majority Act but, rather, again amended 1933 Extra Session P.A. 8. The significance of this is as further indicated, *infra.*

■ Plaintiffs' argument misstates or misconstrues the legal consequences that flow from establishing a given age of majority. It is helpful as a starting point to see what the courts have said about changing the age of majority itself.

■ Many cases involving the effect of a statutory change in the age of majority on a pre-existing status or right express support for the proposition that majority or

minority is a status, rather than a fixed or vested right. *See e. g. In Re Davidson's Will,* 223 Minn. 268, 26 N.W.2d 223 (1947); *Allison v. Allison,* 44 Ohio App.2d 230, 337 N.E.2d 666 (1975). In *Davidson's,* the court explained the distinction. That court held that majority is the age at which the disabilities of infancy are removed. Those disabilities, which are in fact personal privileges conferred on infants by the law of their domicile, constitute limitations on the legal capacity of infants. They, in fact, shield and protect them from acts of their own improvidence, as well as from the acts of others. The removal of these disabilities, however, does not necessarily result in the creation of any new rights, but merely in the termination of certain personal privileges. *See Springstun v. Springstun,* 131 Wash. 109, 229 P. 14 (1934). In the true concept of the term status, therefore, the status of majority or minority by its very nature does not of itself involve any vested right.

This attitude was echoed in a recent Ohio Court of Appeals case, *Allison v. Allison,* where that court determined that

"The rule is settled beyond a doubt that majority or minority is a status rather than a fixed or vested right and that the legislature has full power to fix and change the age of majority . . .
The removal of the disabilities does not result in the creation of any new rights, but merely in the termination of certain personal privileges. There is no vested property right in the personal privileges of infancy."

337 N.E.2d at 668.

Recent holdings of the Supreme Court, although not addressing the issue directly, offers support for the above reasoning. For example, in *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), five Justices, who could not otherwise agree on other aspects of the Court's holding, were in accord in connection with the question whether it was within the states' prerogative to change the legal voting age. Justice Black, for example, stated that: "[t]he establishment of voter age

qualifications is a matter of legislative judgment which cannot be properly decided under the Equal Protection Clause." *Id.* at 127 n.10, 91 S.Ct. at 266. Justice Douglas' opinion is particularly illuminating in this regard. He observed:

[Eighteen-year-olds] are 'generally considered by American law to be mature enough to contract, to marry, to drive an automobile, to own a gun, and to be responsible for criminal behavior as an adult.' Moreover, we are advised that under state laws, mandatory school attendance does not, as a matter of practice, extend beyond the age of eighteen. *On any of these items the States, of course, have leeway to raise or lower the age requirements.*

*Id.* at 142, 91 S.Ct. at 273. (Emphasis added). Moreover, a footnote in the recent Supreme Court decision of *Stanton v. Stanton,* 429 U.S. 501, 97 S.Ct. 717, 50 L.Ed.2d 723 (1976), sheds some helpful light on this matter. There, the Court, in a per curiam opinion, indicated that "[a]s we did in *Stanton I,* we emphasize that Utah is free to adopt either eighteen or twenty-one as the age of majority for both males and females . . . . The only constraint on its power to choose is the principle set out in *Stanton I,* and reiterated here, that the two sexes must be treated equally." *Id.* at 504 n.4, 97 S.Ct. at 719. Similarly, in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451 (1977), the Supreme Court indicated that the question whether to raise or lower the age of majority relative to a particular privilege was an issue of state law. Thus, the view clearly emerges that the states have considerable discretion in either raising or lowering the age requirements with regard to a particular privilege.

Also inherent in plaintiffs' argument is the proposition that once one falls in the category of "legal adult," he/she must forever thereafter be treated as all other adults for all purposes. This argument would preclude any classification of adults into any sub-classes for purposes of regulation. That such is not the case is amply demonstrated by almost any of the cases

involving equal protection challenges since there almost always is a classification of *adults* under attack. The familiar resident versus non-resident classification is but one example. Another would be minimum age limits set for public office. *Manson v. Edwards*, 482 F.2d 1076 (6th Cir. 1973).

Additionally, what is termed the "legal age of majority" is not in effect a defined status that is always identifiable and always changeless. On the contrary, the age of majority is a series of related decisions by the state removing the disability of infancy in the areas specified. For example, the right to vote might be given and the capacity to enter into binding contracts withheld. This is an area in which what the state has given it can later take away, or what it has withheld can later be bestowed as long as there is a rational basis for the state action. No clearer exposition of this principle can be found than in *Craig v. Boren, supra*, where the Court stated, 429 U.S. at 210 n.24, 97 S.Ct. at 463:

> As noted in *Stanton v. Stanton, supra,* 421 U.S., at 17–18, [95 S.Ct. 1373,] the Oklahoma Legislature is free to redefine *any* cutoff age for the purchase and sale of 3.2 beer that it may choose, provided the redefinition operates in a gender-neutral fashion.[1]

(Emphasis added).

Having thus disposed of the equal protection and the Age of Majority issues, it is now necessary to consider the other alleged constitutional violations. Before considering these alleged constitutional intrusions individually, a general comment is appropriate. The court finds all of the other arguments raised to be generally insignificant and of little legal consequence. The raising of these collateral issues in the Opinion of the court represents an attempt by the plaintiffs to interject issues into this case involving "fundamental rights" since it was apparent upon any review of the applicable law that the right to consume alcoholic beverages is not itself a fundamental right.

*Sacramental or Religious Use of Alcohol:*

■ The first such constitutional intrusion alleged is that the amendment would prohibit the use of alcoholic beverages, particularly wine, as part of a religious ceremony or sacrament and thus would be an impermissible intrusion upon the freedom of religion. The attorney general, in response to this argument, commencing at page 11 of his trial brief, has responded fully to this argument and this court adopts the argument and position of the attorney general. In brief summary, there is no such proscription contained within the constitutional amendment adopted by the voters of the State of Michigan due to the fact that the constitutional amendment refers only to the use of alcohol as a beverage and also refers to "personal consumption." The case authority is clear that when alcohol is used for medicinal or sacramental purpose it is not being used as a "beverage." (See for example, *People v. Hinchman*, 75 Mich. 587, 42 N.W. 1006 and the other related cases cited at page 12 of the attorney general's brief.)

■ Although the above referenced legal authority is sufficient to dispose of this argument, it should also be added that there are two other reasons that militate against the construction urged by plaintiffs. First of all, it must be assumed that a modicum of common sense is inherent in the adoption and enforcement of regulatory measures. It is obvious from a reading of the amendment as well as the entire history of liquor regulation within the State of Michigan that the purpose of the amendment had nothing to do with regulating medicinal or sacramental usage of alcoholic beverages.

Furthermore, although this court has earlier held in this Opinion that a constitutional amendment proposed by the electors by initiatory petition must be judged by the

---

1. The above quote from *Craig*, as well as other language in the decision, also disposes of plaintiffs' contention that since females have a better driving record than males that this classification is impermissible. It is clear that no classification would be upheld if, in fact, any gender-based discrimination was involved.

same standards as a legislative act, nonetheless, there are certain practical considerations in the utilization of the power of initiative which must be considered. To begin with, the importance of the electorate retaining this residual legislative power would be greatly diminished if other than a common sense approach were applied to the measures which the electorate initiated. The electorate does not have at its disposal the staff and resources that the state legislature has. Also, there are some practical limitations insofar as putting a question on the ballot is concerned. For example, Article 12, Section 2 provides that the ballot posing the question to the electorate shall contain a statement of the purpose of the proposed amendment expressed in not more than 100 words. This limitation would further dictate, particularly in terms of a constitutional amendment, that the broad purpose of the amendment must be clearly ascertainable but that there may be some details left to subsequent interpretation.

*Rights of Parents and Privacy:*

The next argument which the court will consider is that there are parent plaintiffs in this lawsuit who indicate that they wish to serve alcoholic beverages to their underage children as part of their "cultural" tradition. The way the plaintiffs have pleaded this contention it is difficult to ascertain whether they are referring to cultural tradition in a religious sense or a social sense. To the degree that they are referring to such traditions as part of a religious tradition, what the court has said hereinabove relative to the use of alcoholic substances as a sacrament controls. If the allegation is intended to mean that the intended usage is strictly for a social purpose, then there are two additional answers to this contention.

First, the argument proves too much. If an infringement on the ability of a parent to serve alcoholic beverages to underage children is in fact a defect of constitutional proportion, then there could never be a minimum drinking age because this argument would be applicable regardless of the minimum age set by law.

The other answer to this contention is that given by the Pennsylvania District Court in *Republican College Council of Pennsylvania, et al., v. Winner, et al., supra.* The Pennsylvania court addressed both the issue of parental control as well as the issue of personal privacy which the plaintiffs in this case have also urged in conjunction with this claim. The court stated at page 743:

> Plaintiffs' claim that the Pennsylvania laws violate their own right of privacy, which, while not frivolous, may be disposed of quickly. Access to alcohol is not guaranteed under the concept of personal privacy for the same reason that it is not a fundamental right for equal protection analysis. (Case citations omitted.) Their claim that these laws impermissibly interfere with the ability of their parents to control their education has a stronger constitutional footing. (Citations omitted.) It is especially troubling because of the strong possibility that parental guidance is the best means of inculcating good drinking habits. However, this court cannot ignore the argument of the defendants that drinking inside the home can have a considerable effect on events outside, due to the opportunity for minors to drink and drive. At times, even the rights of parents must yield to state regulation.

*Interference With Employment:*

The court will next examine the argument that this amendment in some way limits employment of persons aged 19 and 20. As a starting point, it should be noted that plaintiffs offer no support for this argument. Additionally, the Act does not prohibit those under 21 from selling or dispensing alcoholic beverages or working in places where such beverages are dispensed. It merely prohibits them along with the rest of the adult population from giving or selling any alcoholic beverage to any person who has not reached the age of 21 years. Accordingly, the court is unable to see any support or justification for the

argument that the employment opportunities of minors are limited in any way.

*Rights of Liquor Licensees:*

 The plaintiffs who are liquor licensees alleged the infringement of their own business rights as well as the equal protection rights of their customers under 21 years of age. *Craig v. Boren, supra,* makes it clear that these arguments may be made by the holders of liquor licenses. Insofar as their equal protection argument is concerned, it has been answered in this Opinion, *supra.* Insofar as their own rights to engage in the liquor business is concerned, this contention is easily answered by the plethora of decisions indicating the control the State is able to exercise over those licensed to deal in alcoholic beverages. The case of *Fitzpatrick v. Liquor Control Commission,* 316 Mich. 83, 25 N.W.2d 118, is typical of the holdings of the Michigan Supreme Court in this regard. In *Fitzpatrick,* the court states:

The control of the sale, use, transportation and consumption of intoxicating liquor is peculiarly within the province of legislative powers, and the regulation, or even prohibition thereof, in many instances, does not deprive an individual of property without due process of law, or deny him equal protection of the laws.

316 Mich. at 92, 25 N.W.2d at 121.

A license to engage in traffic in alcoholic liquor is not a contract in the sense that the licensee has thereby acquired any vested or property rights. It is in the nature of a permit and the traffic is at all times subject to the control of the State in the exercise of its police power.

316 Mich. at 93, 25 N.W.2d at 122.

" 'It has long been uniformly held that there is no inherent right in a citizen to engage in the business of selling alcoholic beverages.' "

316 Mich. at 100, 25 N.W.2d at 125.

It was early settled in this State that the right to regulate or prohibit traffic in intoxicating liquor is based on the police power of the State and that restrictions and conditions which may be imposed upon the liquor traffic are entirely within the discretion of the people, acting through the legislature.

316 Mich. at 100, 25 N.W.2d at 126.

" 'The principle upon which is based the regulation of the liquor traffic is found in the police power of the state. No one possesses a natural, inalienable, or constitutional right to keep a saloon for the sale of intoxicating liquors. "To sell intoxicating liquor at retail is not a natural right to pursue an ordinary calling".' "

316 Mich. at 102, 25 N.W.2d at 126.

The police power of a state is so dominant in the field of liquor regulations that no serious argument can be made on behalf of any licensee that this constitutional amendment is defective since it will in effect cut into their business by taking away their customers under age 21.

*Licensees Under 21 Years of Age:*

 It is also contended that *if* there are any licensees under the age of 21, they *may* risk losing their license. There are three answers to this contention. First, although the court indicated earlier that standing was not an issue in this case, it is in fact an issue insofar as this contention is concerned. There are no plaintiffs in this case who are under 21 years of age and hold liquor licenses, and therefore no one has standing to raise this question. Second, there is nothing in the language of the amendment itself that would dictate this result since, as previously indicated, there is no prohibition in the amendment insofar as persons under 21 serving alcoholic beverages or working in liquor establishments is concerned. The argument made by plaintiffs is premised upon current Rule 5(1)(A) of the Michigan Liquor Control Commission's Licensing Rules which provides:

An applicant for a license shall provide in the application or demonstrate at a hearing all of the following: (a) if an individual, that the applicant is the legal age for consumption of alcoholic liquor in this State; . . .

The above quoted language is merely a rule of the Michigan Liquor Control Commission and, of course, could be changed by them or could be independently challenged. More importantly, however, the language of the rule does not require that persons currently holding a license and being under 21 years of age surrender such a license. It is true that new applicants would not be able to be under the age of 21. However, this is consistent with the police powers of the state to regulate trafficking in alcoholic beverages and it does not result in any vested property rights being disturbed. For these reasons, it is apparent that there is no substance to this contention advanced on behalf of the plaintiffs.

*Challenge to the Michigan Procedures for Amending the Constitution:*

The plaintiffs in *Farrell* allege in Count VII that Article 12, Section 2 of the Michigan Constitution of 1963, which allows a certain percentage of the electorate to place constitutional amendments on the ballot, is violative of the due process clause of the fourteenth amendment for the following reasons:

(1) It does not provide a standard or rule to control a bare majority's authority to enact arbitrary state constitutional provisions;

(2) It does not provide a record of reasons for the amendment sufficient to facilitate judicial review; and

(3) It "permits legislative power to be exercised by a non-deliberative body without any provision for systematic fact-finding, analysis, amendment or compromise; and thus does not provide 'due process of law making.'"

With respect to the third argument, the court has already discussed and disposed of this issue earlier in this Opinion. To recapitulate, however, the court believes that this argument is a product of two recent law review articles: (1) Sager, *Insular Majorities Unabated: Warth v. Seldin and City of Eastlake v. Forest City Enterprises, Inc.,* 91 Harv.L.Rev. 1373 (1978); and (2) Linde, *Due Process of Law Making,* 55 Neb.

L.Rev. 197 (1976). As previously noted, the court has carefully reviewed those articles and the cases cited therein and believes that the arguments set forth in those articles are interesting from an academic standpoint but they do not represent the current state of the law. Accordingly, the court does not believe that further comment is required.

Turning to the first argument, the court finds that the argument is without foundation and meaningless. Insofar as action by the legislature or the electorate acting in a legislative capacity offends the United States Constitution, the injured parties can seek relief in court, as they have done here. The parameters of legislative action always have been defined by the constitution and the courts. They are never spelled out by the legislative branch itself.

In connection with the assertion that Article 12, Section 2, does not provide for making an adequate record from which a reviewing court could make a prudent and reasoned judgment, the court finds that this argument is without sufficient merit to warrant extensive comment. There is simply no requirement that such a "record" be produced. Indeed the legislature of the State of Michigan itself is not required to produce such a record. The argument becomes ridiculous when applied to the exercise of the initiative by the people. Such a requirement as suggested by the plaintiffs would emasculate this important power vested in the people. The Supreme Court's language in *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 672, 96 S.Ct. 2358, 2361, 49 L.Ed.2d 132, is relevant.

Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create. *See, e. g., The Federalist* No. 39 (J. Madison). In establishing legislative bodies, the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the legislature. *Hunter v. Erickson,* 393 U.S. 385, 392, [89 S.Ct. 557, 21 L.Ed.2d 616] (1969).

The reservation of such power . . . is a means for direct political participa-

tion, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to 'give citizens a voice on questions of public policy.' (Citation omitted).

*Irrebutable Presumption:*

■ Plaintiffs in *Farrell* also contend that the constitutional amendment in question offends the due process clause by creating an irrebuttable presumption that "adult citizens under the age of 21 are incompetent to purchase or consume alcohol." (Plaintiffs' Trial Brief, at 33).

The court has directly quoted plaintiffs' phraseology, *supra*, since it clearly demonstrates an attempt to set up a straw man and then knock it over. If, in fact, there is any presumption contained in this amendment, it is not the one suggested by the plaintiffs but, rather, that traffic safety and fatality rates are adversely affected when persons under the age of 21 are allowed legal access to alcoholic beverages. As to this presumption, there is an adequate basis in fact as outlined in this Opinion, *supra*.

The cases and their progeny relied upon by plaintiffs are clearly distinguishable. They involved situations where broad classifications were not necessary because individual determinations were possible. It would obviously not be possible to evaluate 500,000 18, 19 and 20 year olds as to their propensity to drink and then drive in a manner causing accidents and deaths.

Furthermore, the majority of cases relied upon by plaintiffs involve fundamental interests and thus call into play a "strict scrutiny" analysis. Where non-fundamental rights and non-suspect categories are involved, the Supreme Court has indicated that individual determinations do not have to be made even if completely feasible. *Massachusetts Board of Retirement v. Murgia, supra.*

Plaintiffs' reliance on the "least drastic alternative" approach is also misplaced in that this concept is reserved for strict scrutiny equal protection review. *See, e. g.,*

*Rodriguez, supra,* 411 U.S. at 51, 93 S.Ct. 1278.

Finally, since conclusive presumptions are arguably nothing more than classification schemes, *see* Note, *Irrebuttable Presumptions: An Illusory Analysis,* 27 Stan.L.Rev. 449 (1975); Note, *The Irrebuttable Presumption Doctrine In The Supreme Court,* 87 Harv.L.Rev. 1534 (1974), they are essentially reviewed under the principles established in the equal protection cases. Given the facts of this case, the equal protection analysis called for is not strict scrutiny and, thus, plaintiffs' argument relative to irrebuttable presumptions is misplaced and inappropriate.

*Over-Inclusiveness:*

■ Plaintiffs also contend that the classification in question is overbroad since it contains individuals who do not drink and drive, or that drink and drive but do not have a bad accident record, such as women. The first response to this contention is that it is entirely premised on there being only one objective of the constitutional amendment—traffic safety. Although this court has indicated that the amendment is sustainable on that basis alone, the court has in fact found that the objectives of the amendment were broader than just traffic safety.

The second response is that what plaintiff is actually stating is that this is not the "least drastic alternative" available. As the court has indicated, however, this is a strict scrutiny standard and not applicable to the facts of this case.

Plaintiffs also *appeared* to orally argue that the classification is drawn too narrowly since there are problem drinking drivers over the age of 21 also. But a legislative enactment "does not violate the Equal Protection Clause merely because the classifications made . . . are imperfect." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Wherever the line was drawn, it would have a degree of arbitrariness about it.

CONCLUSION:

Having written at length on the individual issues raised in this case, the court will not further lengthen this decision with any formal summary. One additional observation is called for, however.

Undoubtedly many of the 19 and 20 year olds affected by the constitutional amendment feel aggrieved by its passage as well as by this subsequent judicial approval by a court. It must be emphasized in this regard that this court does not have before it the *wisdom* of the action taken by the electorate, but only its constitutionality. It is a difficult area to deal with involving the balancing of important state interests. On the one hand, there is a legitimate concern for the safety, life and limb of the residents of this State. Traffic accidents are the leading cause of death of 18 to 20 year olds. On the other, is the desire of a group substantial in number to have what they perceive to be all of the prerogatives of adulthood.

By adopting the constitutional amendment raising the drinking age, the electorate, in the exercise of their residual legislative power, have come down on the side of protecting life and limb. Dr. Douglass' report (DX G, at 107) states:

The State of Michigan should give serious consideration to raising the minimum legal drinking age. This recommendation is made with due regard for arguments supporting the 18 year-old drinking age on some economic and human rights positions; we cannot, however, in clear conscience, report that a legal change responsible for at least 4,600 crash involvements, of which at least 89 involved one or more deaths, between 1972 and 1975, should be sustained. Human costs of such magnitude require action.

RELIEF:

Plaintiffs having failed to carry their burden of proof that the classification established by the constitutional amendment under attack offends the Equal Protection Clause of the Constitution and, similarly, having failed with regard to their other constitutional arguments, the request for injunctive relief is denied and a judgment of no cause of action in favor of the defendants shall be entered.

No costs are awarded since an important public question was at issue.